**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Seth Burns, | No. CV-16-08033-PCT-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| United States of America, | |
| Defendant. | |

Before the Court is Defendant's Motion for Summary Judgment Re: Discretionary Function Exception (Doc. 28).

**I. BACKGROUND**

In the early morning of September 10, 2013, Plaintiff and other employees of a cell phone tower/radio maintenance company encountered boulders on Road 557, which provides access to cell tower sites on Mount Elden in the Coconino National Forest. Although the boulders in the road blocked vehicle access to the cell towers, they did not present any danger. While the group was attempting to move a large boulder blocking the road, another boulder rolled down the hill, severely injuring Plaintiff.

Plaintiff seeks damages against the United States under the Federal Tort Claims Act ("FTCA"), which waives the government's sovereign immunity for tort claims arising out of negligent acts or omissions of federal employees acting within the scope of their employment, with certain limitations and exceptions. The Complaint alleges that before September 10, 2013, significant rain fell on Mount Elden, resulting in boulders

rolling down the mountain and onto Road 557. It further alleges that before September 10, 2013, "Defendants were aware of [or] should have been aware of the issue with boulders endangering persons using the Road" and "knew or should have known of the dangers to users of the Road" and "that the condition of the Road was unreasonably dangerous." It also alleges that "Defendant failed to address the dangers posed by the conditions, thereby breaching their [*sic*] duties to Plaintiff and the public." The Complaint does not identify a specific federal employee or employees who allegedly committed the tort for which the United States should be held liable. Nor does it expressly allege a specific act or omission that caused Plaintiff's injuries.

In his response to the motion for summary judgment, Plaintiff contends that the gate on Road 557 should have been closed before he arrived at the scene of the rockslide. He does not state when he believes the gate should have been closed, and he does not identify any individual responsible for deciding whether to close the gate. Plaintiff contends the decision whether to close the gate was not discretionary and could have been performed by any Forest Service field employee because the conditions at the time of the accident presented imminent danger. Plaintiff does not contend that he was injured by any of the boulders or rocks that had already fallen onto Road 557 before he arrived. In essence, Plaintiff reasons that the Forest Service should have closed Road 557 in anticipation of the rockslide that injured him.

Defendant contends that Plaintiff's claim is barred by the discretionary function exception to the FTCA because the claim is based on the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the government. *See* 28 U.S.C. § 2680(a). Although Defendant has pled additional defenses, it sought and received leave to pursue focused discovery and summary judgment based solely on the discretionary function exception. It contends that no statute, regulation, or policy directed any federal employee to take any specific action under the conditions that occurred in September 2013, including closing Road 557 or removing or securing loose boulders from the hillside above Road 557. For the

purpose of the pending summary judgment motion, therefore, the Court does not consider whether the Complaint sufficiently states a claim under the FTCA or under Arizona negligence law.

**II.    LEGAL STANDARD**

Summary judgment is proper if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of identifying the basis for its motion and those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To defeat a motion for summary judgment, the nonmoving party must show that there are genuine issues of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A material fact is one that might affect the outcome of the suit under the governing law. *Id.* at 248. A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"A court must view the evidence 'in the light most favorable to the [non-moving] party.'" *Tolan v. Cotton*, __ U.S. __, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 249). But it is not the Court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The evidence presented by the parties must be admissible. LRCiv 56.1(a), (b); *see* Fed. R. Civ. P. 56(e). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. 56(e)(2).

### III. UNDISPUTED MATERIAL FACTS

#### A. The National Forest System and Road 557

Plaintiff's injuries occurred on Road 557 in the Coconino National Forest. The National Forest System consists of "units of federally owned forest, range, and related lands throughout the United States and its territories, united into a nationally significant system dedicated to the long-term benefit for present and future generations." 16 U.S.C. § 1609(a). The National Forest Service manages the roads under its authority and control through a nationwide forest transportation system. Congress found:

> [T]he construction and maintenance of an adequate system of roads and trails within and near the national forests and other lands administered by the Forest Service is essential if increasing demands for timber, recreation, and other uses of such lands are to be met; that the existence of such a system would have the effect, among other things, of increasing the value of timber and other resources tributary to such roads; and that such a system is essential to enable the Secretary of Agriculture (hereinafter called the Secretary) to provide for intensive use, protection, development, and management of these lands under principles of multiple use and sustained yield of products and services.

16 U.S.C. § 532. Congress declared that a system of transportation to service that National Forest System be installed "to meet anticipated needs on an economical and environmentally sound basis." 16 U.S.C. § 1608(a). "Roads constructed on National Forest System lands shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources." 16 U.S.C. § 1608(c). Congress provides funds for the National Forest System roads, and appropriations generally are used to construct and maintain forest service roads and routes.

Chapter 7730 of the Forest Service Manual ("FSM") addresses road operation and maintenance. FSM 7730.2 requires the Forest Service to operate and maintain National Forest System roads in a manner that meets road management objectives and provides for safe and efficient travel; access for the administration, utilization, and protection of National Forest System lands; and protection of the environment, adjacent resources, and

public investment. FSM 7733.04c(2) states that it is the responsibility of forest supervisors to provide for "identification of design and operational aspects of [National Forest System] roads that are potential high hazards, including railroad crossings, bridges with limited load carrying capacity, and cattle guards with restricted width." It does not mention naturally occurring hazards, such as rockslides, or maintaining hillsides. It requires forest supervisors to provide for "development of an action plan that establishes priorities for corrective measures based on traffic volume, traffic mix, and severity of the hazard." FSM 7733.04c(3) states, "To the extent permitted by funding levels, systematically provide for elimination of identified hazards." There are no regulations that require the Forest Service to take immediate and specific actions to remove or address alleged roadside or roadway hazards. FSM 7733.04c does not address or refer to road closures, much less direct forest supervisors to close roads under certain circumstances.

Under National Forest Service regulations,

(a) The Chief, each Regional Forester, each Experiment Station Director, the Administrator of the Lake Tahoe Basin Management Unit, and each Forest Supervisor may issue orders which close or restrict the use of described areas within the area over which he has jurisdiction. An order may close an area to entry or may restrict the use of an area by applying any or all of the prohibitions authorized in this subpart or any portion thereof.

(b) The Chief, each Regional Forester, each Experiment Station Director, the Administrator of the Lake Tahoe Basin Management Unit, and each Forest Supervisor may issue orders which close or restrict the use of any National Forest System road or trail within the area over which he has jurisdiction.

36 C.F.R. § 261.50. Although Forest Service regulations require public involvement in decisions regarding designation of National Forest System roads, public involvement is not required for the responsible official to implement temporary, emergency closures pursuant to 36 C.F.R. § 261.50 to provide short-term resource protection or to protect public health and safety. 36 C.F.R. § 212.52(b)(1). If the responsible official determines

that motor vehicle use on a National Forest System road "is directly causing or will directly cause considerable adverse effects on public safety . . . the responsible official shall immediately close that road, trail or area to motor vehicle use until the official determines that such adverse effects have been mitigated or eliminated and that measures have been implemented to prevent future recurrence." 36 C.F.R. § 212.52(b)(2). As soon as practicable after the closure, the responsible official shall provide public notice of the closure, including reasons for the closure and the estimated duration of the closure. *Id.*

The Coconino National Forest has approximately 5000 miles of forest roads, many of which are mountainous and surrounded by hills, rocks, and boulders. The Kaibab National Forest has approximately 3000 miles of forest roads. One road crew of six to eight Forest Service employees maintains the roads in both the Coconino National Forest and the Kaibab National Forest.

Road 557 is a Level 2 road in the Coconino National Forest and is not managed as a public road. Forest Service officials are given discretion to implement safety management systems for roads not managed as public roads, such as Level 2 roads. The Forest Service Manual states that Level 2 is the classification for roads open for use by high clearance vehicles for which passenger car traffic, user comfort, and user convenience are not considerations. It also states, "Motorists should have no expectations of being alerted to potential hazards while driving these roads."

Road 557 accesses cell phone towers on Mount Elden, which are owned, operated, and maintained by cell phone businesses, including members of the Mount Elden Improvement Association ("Users Association"). Membership in the Users Association is open to every holder of a lease or permit for use of the areas designated by the Coconino National Forest for radio sites. The Users Association's constitution states that the purpose of the Association is to represent permittees as a group dealing with the Coconino National Forest and to "work in cooperation with the Forest Service on snow

removal and road maintenance, protection, and use of the road for which this Association may be recognized."

The cell phone towers accessed by Road 557 service tens of thousands of cell phone customers in northern Arizona. Road 557 also provides access to the Coconino National Forest to hunters, mountain bikers, and birdwatchers, and it is one of the most popular recreational areas in the forest. In addition, it provides access to radio towers on Mount Elden. Road 557 had no history of rockfalls before July 2013.

All Coconino National Forest employees can lock a gate on a Forest Service road if they identify a condition they deem to be unsafe. There is not a specific protocol for deciding whether to temporarily lock a gate, but if a Forest Service employee sees an imminent danger to the public and is able to close the road, he or she should close it, at least temporarily. Typically, the employee would consult with the ranger or forest engineer before closing a gate, but otherwise would do so immediately after closing a gate. Public safety is the top priority, but if public danger is not imminent, decisions regarding road closures involve analysis of social and economic implications. Formal road closures usually involve engineers preparing a list of factors to be considered by a ranger or forest supervisor who would decide whether to close a road. Deciding whether to close Road 557 would include considering the impact on access by the Users Association to the cell tower sites and by recreational users.

Before removing boulders from a hillside, the Forest Service would evaluate the slope failure and the potential environmental impact of remediation measures. Moving a boulder off the top section of a slope could destabilize the slope. The Forest Service would consider whether remediation would affect natural resources, wildlife, archeological sites, and cultural resources. Before deciding to take remedial measures, the Forest Service would also consider allocation of its finite resources to maintain and address road and forest conditions.

**B.     The Rockslide on Road 557**

On July 26, 2013, Tom Burhyte of the Western Area Power Agency ("WAPA") sent an email and photograph to Sheila Sandusky of the Verde Ranger District, Prescott National Forest, and others regarding a boulder blocking the road to gain access to the Mount Elden sites. Burhyte asked when it was expected the road would be cleared so that, if necessary, WAPA could make arrangements to get there without using a vehicle. Sandusky replied that the Coconino Forest Service was aware of the boulder, but there were many blocked roads because of the monsoon, and the engineering department's priority was to ensure that campers and the public were not blocked behind boulders and landslides. She also said it was her understanding that they currently did not have equipment big enough to move the boulder Burhyte reported. Sandusky identified Beth Dykstra as the contact person for the Coconino Forest Service and Ron Strohmeyer as the President of the Users Association. Sandusky also said Dykstra told the Users Association they could move the boulder if they had the equipment. Sandusky warned Burhyte there were two more boulders on that road that likely would loosen with the next rains and his best bet was to contact Strohmeyer.

On July 27, 2013, Burhyte emailed Dykstra and Strohmeyer, asking whether they could predict when the boulder would be removed. Copying numerous recipients, Strohmeyer responded that there was no date when the boulder would be removed. Strohmeyer said he had driven and walked the road on July 26, 2013, to see for himself the rock issues. He reported that in addition to the "BIG one," there were a couple of smaller rocks in the road "that you can get around," and "at least 6 more on the uphill side of the road that will probably fall during the next rain or 2." He included photographs and said, "As Beth noted in her emails a few days ago the site owners are authorized to get the rocks removed, at their expense, to facilitate access to their sites. So, if WAPA has the equipment and expertise to deal with the rocks feel free to have them removed." Forest Service employees Ed Monin and Mike Bathen were identified among the recipients of the email thread.

- 8 -

Bathen, a Forest Service district engineering technician, testified that after learning of Strohmeyer's July 27, 2013 email, he drove to the location, assessed the situation, and relayed information to his supervisor John O'Brian and possibly Ed Monin. Bathen concluded that the conditions did not pose imminent danger to the public at that time. Monin, a Forest Service assistant forest road engineer/road manager, testified that he reviewed Strohmeyer's July 27, 2013 email within days of it being sent and intrinsically weighed factors such as what engineering would be needed to address the situation, costs, the resources and manpower available, economic and social impact, and whether remediation could cause a more severe landslide. Monin also testified that he considered the effect of a road closure on recreational activities. He further testified that there were numerous other areas in the Coconino National Forest with rocks that could fall.

On Friday, September 9, 2013, at 10:25 p.m., Glenn Carlson of Verizon Wireless sent an email to members of the Users Association, the Forest Service, and others, reporting a rockslide blocking the road to Mount Elden and attaching photographs. He said the rocks were about three miles past the gate. Carlson described one rock as "about 7 feet tall and 3 feet square" and another as "about 4 feet tall and 3 feet square." He said that first thing in the morning he would try to get around the rocks with a Jeep Wrangler, but he did not believe a full-size truck could get through. Carlson said, "We will need to get this cleared before the inspections next week." Carlson's email did not mention loose rocks or boulders on the hillside, potential additional rockslides, or imminent danger to the public. The following morning, Bathen read Carlson's email and was preparing to go to the site when he learned of the accident involving Plaintiff, which occurred at approximately 7:00 a.m.

On September 10, 2013, at 7:19 am., the Coconino County Sheriff Office ("CCSO") received a 911 call reporting that Plaintiff was pinned under a boulder on Road 557. At 7:35 a.m., CCSO was informed that Plaintiff had been extracted. CCSO units arrived at 7:41 a.m. and began first aid treatment. Plaintiff's crew reported they worked for a cell phone/radio maintenance company and were on their way in three

separate vehicles to the Mount Elden Lookout area to work on one of the towers. They reported that while they were removing rocks and boulders from the road using a truck and a tow strap, additional rocks and boulders slid down the hill toward them. One of the large boulders struck and pinned Plaintiff. The others were able to lift the rock using hydraulic jacks and extract Plaintiff. Plaintiff was transported to the Flagstaff Medical Center.

Bathen testified that between 7:30 a.m. and 8:30 a.m. on September 10, 2013, he read Carlson's email and within 15-30 minutes began preparing to go to the scene of the rockslide on Road 557. By the time he arrived at the scene, the accident had occurred, and everyone had left. Bathen testified that when he left, he locked the gate on Road 557 behind him because the road was impassable and also to preserve the accident scene for investigation. Bathen did not recall having ever closed a gate previously except for significant snowfall. He testified that there is no official process to respond to reported hazards, but a report probably would be evaluated through the district ranger who would decide whether to close a road.

Shortly after the accident, on September 10, 2013, the Forest Service engineers inspected the area and determined that the site was unsafe until weather and terrain conditions improved. Road 557 was closed the same day. On September 13, 2013, Forest Service engineers cleared Road 557 of the rocks and debris. The area was reopened to the public on September 17, 2013.[1]

**IV. ANALYSIS**

    **A. The Discretionary Function Exception to Application of the Federal Tort Claims Act**

        **1. General Principles**

The Federal Tort Claims Act ("FTCA") imposes liability on the United States for tort claims against federal employees in the same manner and to the same extent as a

---

[1] The record does not indicate whether any boulders remaining on the hillside above Road 557 were moved or stabilized.

private individual would be liable to the claimant under like circumstances, subject to certain defenses and exceptions. 28 U.S.C. § 2674. One exception to the FTCA's applicability is:

> Any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion be abused.

28 U.S.C. § 2680(a). The discretionary function exception covers only acts that involve an element of judgment or choice, which is not satisfied if a federal statute, regulation, or policy specifically directs a course of action for an employee to follow. *United States v. Gaubert*, 499 U.S. 315, 322 (1991). Because the purpose of the exception is to prevent judicial "second guessing" of legislative and administrative decisions grounded in social, economic, and political policy through a tort action, it applies only to governmental actions and decisions based on considerations of public policy. *Id.* at 323. Therefore, "the actions of Government agents involving the necessary element of choice and grounded in the social, economic, or political goals of [a] statute and regulations are protected." *Id.*

> When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.

*Id.* at 324-25. "The exception protects only government actions and decisions based on 'social, economic, and political policy.' The decision need not be actually grounded in policy considerations, but must be, by its nature, susceptible to a policy analysis." *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998) (Forest Service's decision regarding

how to attack a fire involved balancing of considerations, including cost, public safety, firefighter safety, and resource damage).

Thus, a two-step analysis is required to decide whether the discretionary function exception applies: (1) determine whether the challenged actions involve an element of judgment or choice and (2) determine whether the judgment or choice is based on public policy considerations. *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008). When a specific course of action is not prescribed by statute, regulation, or policy, an element of choice or judgment likely is involved in the decision or action. *Id.* If a statute, regulation, or policy permits an employee to exercise discretion, it is presumed that the employee's acts are grounded in policy when exercising that discretion. *Id.* at 1130.

The government bears the burden of proving the applicability of the discretionary function exception. *Id.* at 1128. It does not need actual evidence of policy-weighing in any specific decision, but it must show that the decisions taken are susceptible to policy analysis to meet its burden. *Id.* at 1134. "It is not sufficient for the government merely to waive the flag of policy as a cover for anything and everything it does that is discretionary in nature." *Id.*

### 2. Particularized Analyses

"Whether a challenged action falls within the discretionary function exception requires a particularized analysis of the specific agency action challenged." *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002); *accord Terbush*, 516 F.3d at 1129. Generally, the design of a governmental course of action is protected by the discretionary function exception, but the implementation of that course of action is not. *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005). Matters of scientific and professional judgment, especially concerning safety, rarely are considered to be based on considerations of social, economic, or political policy. *Id.*; *Soldano v. United States*, 453 F.3d 1140, 1148 (9th Cir. 2006) (although road design required balancing social,

economic, and political considerations, setting a safe speed limit for the road as designed was essentially a matter of scientific and professional judgment).

The decision to adopt a safety precaution may be based in policy considerations, but once adopted, the implementation of a precaution is not. *Whisnant*, 400 F.3d at 1182. Therefore, the discretionary function exception does not apply where the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing public policy considerations. *ARA Leisure Servs. v. United States*, 831 F.2d 193, 195-96 (9th Cir. 1987) (failure to maintain road in compliance with Park Service standards was not discretionary despite budgetary constraints). Matters of routine maintenance usually do not involve policy-weighing decisions or actions, but "sometimes 'maintenance' is far from routine and may involve considerable discretion that invokes policy judgment." *Terbush*, 516 F.3d at 1133-34.

In *Whisnant*, governmental regulations required periodic safety inspections of a submarine base commissary, but did not dictate how and when to conduct the inspections. 400 F.3d at 1181. Safety inspection reports over a period of three years showed the accumulation of toxic, carcinogenic mold in the meat department of the commissary, which caused customers and employees to become ill. The Ninth Circuit held that controlling the accumulation of toxic mold in a commissary was a matter of safety, not policy. Although "the question of *whether* the government was negligent is irrelevant to the applicability of the discretionary function exception, the question of *how* the government is alleged to have been negligent is critical." *Id.* at 1185 (citation omitted). The discretionary function exception did not bar a claim that the government negligently ignored health hazards that were called to its attention, but the exception may have barred any claim based on the government's decision to hire contractors to conduct the safety inspections or the government's design of safety regulations. *Id.*

Similarly, in *Young v. United States*, the Ninth Circuit emphasized that "determining the precise action the government took or failed to take (that is, how it is alleged to have been negligent) is a necessary predicate to determining whether the

government had discretion to take that action." 769 F.3d 1047 (9th Cir. 2014). In *Young*, plaintiffs alleged that the Park Service knew that a transformer buried under twelve feet of snow near the Mount Rainier National Park visitor center released heat, but did not place a warning sign nearby. The heat caused a large cavity in the snowfield through which a woman fell twelve feet onto concrete. Plaintiffs alleged that the Park Service was negligent in failing to warn of a particular danger that it both knew of and created. The parties agreed that the decision not to place warning signs at or near the transformer was a discretionary decision, which satisfied the first step of the analysis. After reviewing the specific policies that the government contended formed the basis of its decision, the Ninth Circuit concluded that the Park Service's decision not to warn of the latent dangers associated with the transformer near the visitor center was a decision "totally divorced" from the policies that the government identified as the basis for its decision. *Id.* at 1057. Therefore, the government failed to show that the decision was susceptible to policy analysis as required under the second step of the analysis, and the discretionary function exception did not apply.

In *Childers v. United States*, the discretionary function exception barred claims arising out of the death of a child in a winter hiking accident on an unmaintained trail in Yellowstone National Park. 40 F.3d 973 (9th Cir. 1994). Unable to maintain a large number of the trails in the Park in winter and unable to post signs throughout the Park (more than 2.2 million acres that contained approximately 97 trails ranging more than 1,200 miles in length), the Park Service had two options: (1) close large portions of the Park or (2) keep the Park open, provide visitors with information on the hazards, and take steps to discourage visitors from going to hazardous areas. *Id.* at 976. A Park Service regulation provided: "If roads and trails cannot be maintained as designed and built, they should either be closed or the public adequately warned." The regulation did not prescribe the precise manner in which the public was to be warned about trails left open but not maintained in the winter. The Park Service provided warnings through park brochures, visitor center displays, bulletin board information, and personal contacts. The

discretionary function exception applied because "Park rangers used their discretion to balance, within the constraints of the resources available to them, a statutory mandate to provide access with the goal of public safety." *Id.*

In *Valdez v. United States*, the discretionary function exception barred claims by a hiker who climbed ninety feet up the side of a waterfall in Kings Canyon National Park, crossed the creek at the top, attempted to descend down the other side, and fell to the base of the falls. 56 F.3d 1177 (9th Cir. 1995). The hiker alleged the Park Service created known dangerous conditions by having inadequate warning signs, failing to have guard rails or to otherwise keep the area safe, failing to erect barriers to prevent people trying to cross the creek, and failing to properly warn the public of potential hazards through educational materials or brochures. *Id.* at 1178. The Ninth Circuit held that the Park's policy guidelines provided a broad mandate to warn the public of "special hazards," which necessarily involved an element of discretion in identifying such hazards. *Id.* at 1180. It also found "the challenged conduct clearly implicates a choice between the competing policy considerations of maximizing access to and preservation of natural resources versus the need to minimize potential safety hazards." *Id.* It further reasoned that "with limited resources and unlimited natural hazards," the Park Service must make a public policy determination of which dangers are obvious and which merit a warning brochure. *Id.*

In *Blackburn v. United States*, the discretionary function exception barred claims by a Yosemite National Park visitor who dove off a bridge with six signs stating "DANGEROUS TO DIVE FROM BRIDGE." 100 F.3d 1426 (9th Cir. 1996). As in *Valdez*, general policy guidelines and regulations did not impose mandatory duties of care, but rather created broad policy goals attainable only by the exercise of discretionary decisions. *Id.* at 1433. The Ninth Circuit found that the Park Service made a decision to use signs to warn the public of the danger of diving off the bridge instead of placing barriers along the bridge so as to not unduly inhibit visitor enjoyment of the area or endanger the riparian environment. *Id.* at 1434.

In *Terbush*, the discretionary function exception barred a failure-to-warn claim by the family of a mountain climber who was killed by a rockslide in Yosemite National Park. 516 F.3d at 1128. Three weeks earlier, park staff had temporarily closed the area after a rockfall while the area was inspected and declared to be safe. *Id.* No warning signs were posted. Park policies and guidelines directed the Park Service to balance access with safety and to consider conservation and resources in designing area plans, determining the safety of particular areas, and choosing the precise manner in which to warn the public of hazards. *Id.* at 1135. The Ninth Circuit found it was necessary for the Park Service to exercise its discretion in determining the extent of the rockfall hazard and the appropriate response to it, and decisions made regarding warning the public were grounded in the Park Service's policy regime. *Id.* at 1139.

### B. Deciding Whether to Close the Gate on Road 557 Involved an Element of Judgment and Was Based Upon Public Policy Considerations.

The challenged action here is the Forest Service's decision not to close the gate on Road 557 before Plaintiff arrived at the accident scene.

Element of Judgment. No statute, regulation, or policy expressly directs Forest Service employees when to close roads in the National Forest System. Forest Service regulations identify a few officials who may issue orders to close or restrict the use of a National Forest System road upon a determination that motor vehicle use on the road "is directly causing or will directly cause considerable adverse effects on public safety." 36 C.F.R. §§ 212.52(b)(2), 261.50. Plaintiff contends that the decision whether to close the gate to Road 557 was not discretionary because two Forest Service employees testified they would have closed the gate and because FSM 7733.04c, as interpreted by Plaintiff, requires the Forest Service to eliminate all unsafe conditions, subject only to budgetary conditions. Neither argument is persuasive.

FSM 7733.04c does not require the Forest Service to eliminate all unsafe conditions. It requires the Forest Service to identify "design and operational aspects of NFS roads that are potential high hazards" and to "systematically provide for elimination

of identified hazards" to the extent permitted by funding levels. General directives to maintain roads for "safe and efficient travel" and to identify and prioritize correction of "potential high hazards," such as railroad crossings, do not specifically direct a course of action in response to rockslides or potential rockslides. FSM 7733.04c does not mention road closures.

Plaintiff also contends that the decision whether to close the gate on Road 557 was not discretionary because two Forest Service employees testified that safety is their top priority and they would have closed the gate if the public was at risk of serious injury or death on a Forest Service road. But a "safety first" policy does not eliminate the need to make a judgment regarding whether conditions posed a risk of serious injury and how likely and imminent the potential harm was. Testimony established that decisions regarding road closures involve weighing of multiple factors.

Plaintiff further contends that Forest Service employees lacked discretion regarding closing the gate because two of them conceded that the conditions on Road 557 immediately preceding Plaintiff's injuries posed an imminent danger. However, the conclusion that the conditions posed an imminent danger was based on the fact that a boulder had rolled down the hillside and injured Plaintiff. Moreover, it was impossible to close the gate after the Forest Service received notice of the conditions on September 10, 2013, and before Plaintiff was injured, because both occurred at approximately the same time. Even if it had been possible, a Forest Service employee would have needed to see the conditions on Road 557 and make a judgment that they posed an imminent danger before deciding to close the gate.

Plaintiff does not contend that the conditions on Road 557 in July 2013 constituted such an imminent danger that the Forest Service lacked discretion regarding whether to close the gate at that time. In July 2013, there was a large boulder plainly visible in the road and the potential for additional rockslide caused by future rain. The conditions did not present an immediate, concealed danger such as toxic, carcinogenic mold in a

commissary's meat department or a large cavity hidden underneath snow near a visitor center.

Therefore, the decision whether to close the gate on Road 557 involved an element of judgment.

Public Policy Considerations. Plaintiff contends that even if the Forest Service had discretion regarding whether to close the gate on Road 557, field employees would not, and did not, perform policy-level analysis regarding whether to close the gate.[2] He relies entirely on the fact that, after Plaintiff was injured by the rockslide on September 10, 2013, Bathen locked the gate to preserve the accident scene for investigation and because the road was impassable. Although Bathen did not consciously weigh competing public policy considerations in doing so, Forest Service engineers subsequently made the determination to close Road 557 until weather and terrain conditions improved.

Closure of a road in the National Forest System is "susceptible to policy analysis." *See Gaubert*, 499 U.S. at 325. Road closures may be ordered only by the Chief, a Regional Forester, Experiment Station Director, or Forest Supervisor. 36 C.F.R. § 261.50(b). Classifying Road 557 as a Level 2 road was a determination that it would not be managed as a public road and motorists should not expect to be alerted to potential hazards on Road 557. Competing policy considerations regarding closing Road 557 include the need for safety, access to cell and radio towers, and recreational use.

The record shows that public policy considerations were in fact weighed regarding Road 557 conditions before the September 10, 2013 accident. In July 2013, Sandusky said the Coconino Forest Service was aware of many blocked roads because of the monsoon, and the priority was to ensure that campers and the public were not blocked

---

[2] Plaintiff also asserts in passing that "addressing the boulders" also would have prevented the accident. If he is referring to the boulders that had fallen onto Road 557, those boulders did not cause Plaintiff injury. Moving them would not have prevented further rockslide. If Plaintiff is referring to loose boulders on the hillside, he does not assert that the Forest Service lacked discretion to decide how to manage loose rock on hillsides near Level 2 roads or that such a decision would not involve weighing of competing policy interests.

behind boulders and landslides. She also said she thought the Forest Service did not have equipment big enough to move the boulder reported by Burhyte of WAPA. She warned Burhyte of two more boulders likely to loosen with more rain. The following day Strohmeyer of the Users Association reported to the Forest Service and to members of the Users Association that there were at least six more rocks on the hillside likely to fall with more rain. He referred to an email from Dykstra of the Forest Service a few days before, which informed the cell tower site owners they were authorized to remove rocks from the road. Bathen and Monin, both Forest Service employees, received Strohmeyer's email, and Bathen assessed the situation in person. Bathen did not think the conditions posed imminent danger to the public at that time. Monin weighed factors, including costs and risks associated with remediation and the effect of a road closure on recreational activities. Therefore, the decision not to close Road 557 in July 2013 was based on weighing of public policy considerations.

In September 2013, the night before Plaintiff's accident, Carlson of Verizon Wireless reported a rockslide blocking vehicle access on Road 557. He did not report imminent danger or the potential for additional rockslides. The next morning, shortly after receiving Carlson's email, Bathen began preparing to go to the scene of the rockslide and learned of the accident. No decision regarding road closure was made in response to Carlson's email because the accident occurred before any assessment or decision could be made. Plaintiff does not contend that the Forest Service should have provided staffing 24 hours/day to receive and respond to reports of rockslides.

Therefore, the decision whether to close Road 557 involved an element of judgment and was based on public policy considerations. Plaintiff's claim is barred by the discretionary function exception to the FTCA.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment Re: Discretionary Function Exception (Doc. 28) is granted.

/ / /

/ / /

IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Defendant and against Plaintiff and that Plaintiff take nothing. The Clerk shall terminate this case.

Dated this 4th day of December, 2017.

*Neil V. Wake*
Neil V. Wake
Senior United States District Judge